[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 5, 2006
THOMAS K. KAHN
CLERK

_____

No. 04-13455

_____

D. C. Docket No. 03-00195-CR-C-S

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

MALCOLM E. MCVAY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

**(May 5, 2006)**

Before DUBINA and MARCUS, Circuit Judges, and GOLDBERG[*], Judge.

MARCUS, Circuit Judge:

---

[*] Honorable Richard W. Goldberg, Judge, United States Court of International Trade, sitting by designation.

The United States appeals from a sentence of 60 months' <u>probation</u> imposed by the district court on Malcolm E. McVay, the former Chief Financial Officer, Senior Vice-President, and Treasurer of HealthSouth Corporation ("HealthSouth"). McVay pled guilty to conspiracy to commit wire and securities fraud that resulted in losses of some $400 million, and to false certification of financial information filed with the Securities and Exchange Commission ("SEC"). On appeal, the government argues that the trial court erred by downwardly departing so drastically from the Sentencing Guidelines range -- from an offense level 29 to an offense level 8 -- based on the government's substantial-assistance motion, filed pursuant to 18 U.S.C. § 3553(e) and U.S.S.G. § 5K1.1. This 21-level departure resulted in an adjustment from a Guidelines sentencing range of 87 to 108 months' imprisonment to a sentencing range of 0 to 6 months' imprisonment. The government says that this extraordinary downward departure was unwarranted as a substantial-assistance adjustment.

After careful review of the record and the parties' briefs and oral arguments, we conclude the district court reversibly erred by downwardly departing so sharply, based on substantial assistance, virtually without explanation, and on a wholly improper basis. Accordingly, we vacate McVay's sentence and remand for resentencing consistent with this opinion.

# I.

This is the fourth appeal by the United States challenging what we have called "dramatic" and "extraordinary" downward departures awarded by the district court, without sufficient record support. See United States v. Livesay, 146 F. App'x 403 (11th Cir. 2005) (reversing "dramatic" 18-level reduction in offense level based on record that provided "scant basis to assess reasonableness" of departure); United States v. Botts, 135 F. App'x 416 (11th Cir. 2005) (reversing "extraordinary" 26-level reduction in offense level based on record that "is incapable of meaningful appellate review"); United States v. Martin, 135 F. App'x 411 (11th Cir. 2005) (reversing "extraordinary" 21-level reduction in offense level based on record that "is incapable of meaningful appellate review"). All arise out of crimes, to which all four defendants, former executives of HealthSouth, pled guilty, in connection with a massive, multibillion-dollar securities fraud. As in the other three cases, the instant offenses occurred in the course of a conspiracy by senior officers of HealthSouth, one of the nation's largest providers of outpatient surgery, diagnostic imaging, and rehabilitative healthcare services. HealthSouth has approximately 1,800 locations in all fifty states, Puerto Rico, the United Kingdom, Australia, and Canada. HealthSouth is an issuer of a class of securities registered under Section 12 of the Securities and Exchange Act of 1934, 15 U.S.C.

§ 78l. Because its common stock was listed on the New York Stock Exchange, HealthSouth was required to comply with federal securities laws and regulations to ensure that the company's financial information was accurately reported and disclosed to the public.

Beginning in 1994, if not earlier, senior officers of HealthSouth conspired to inflate sharply financial statements filed with the SEC, including the company's Forms 10-Q and 10-K for years 1994 through 2002. Publicly traded corporations must file the Form 10-Q quarterly and the Form 10-K annually with the SEC, pursuant to the Securities Exchange Act of 1934, 15 U.S.C. § 78m, and 17 C.F.R. §§ 240.13a-1, 240.13a-13. The conspirators accomplished this earnings inflation in the financial statements by making false entries in HealthSouth's books and records and presenting false financial reports to banks and other lenders. Some of HealthSouth's officers, including McVay, took these actions after recognizing that the company's financial results were not producing sufficient earnings to meet or exceed Wall Street "earning expectations" or "analyst expectations" and that these shortfalls would lead to a decline in the market price of HealthSouth's securities.

Over the course of the conspiracy, the cumulative inflations amounted to about $400 million. When the conspiracy was uncovered in March 2003, the SEC temporarily suspended trading and the total drop in value of the outstanding stock

4

was approximately $1.4 billion. While the investing public, HealthSouth shareholders, and the company were the direct victims of the conspiracy, the scheme collaterally affected many others, including: HealthSouth employees, several of whom were fired when the conspiracy was discovered, and particularly those who had participated in the company's stock ownership plan or pension fund and were long-time employees close to retirement; employees of contractors who were dependent on HealthSouth contracts for income; banks and other lenders who loaned money to HealthSouth based on the false financial information; and health-service competitors who lost business or financing, again based on HealthSouth's false financial representations.

Malcolm McVay was employed at HealthSouth from September 1999 to May 2003. In September 2000, he was promoted to Senior Vice-President and Treasurer. From August 27, 2002 to January 3, 2003, McVay was the Chief Financial Officer ("CFO") and Treasurer of the company. Finally, in April 2003, he served solely as Treasurer. Shortly after he became CFO in August 2002, McVay learned that revenue had been materially overstated in prior quarters and that cash was materially overstated on the balance sheet. At the plea colloquy, McVay informed the district court that the person who told him about the irregularities was Emery Harris, who was then serving as Group Vice-President

5

and Controller.  McVay also spoke to the then-current CEO, Richard Scrushy, who informed McVay that it was okay to sign the 10-Q because irregularities in the numbers on the form were "commonplace." Despite this knowledge, on or about November 14, 2002, McVay signed HealthSouth's 10-Q Form for the third quarter of 2002, knowing that it did not fairly represent the financial condition at Health South.

On April 21, 2003, in a three-count information, McVay was charged with conspiracy to commit wire and securities fraud, in violation of 18 U.S.C. § 371 ("Count 1"), and falsification of financial information filed with the SEC, in violation of 18 U.S.C. § 1350 and 18 U.S.C. § 2 ("Count 2").  The information also included a forfeiture count, pursuant to 18 U.S.C. § 981 and 28 U.S.C. § 2461(c).  McVay pled guilty to all three counts under a plea agreement in which the government agreed to recommend that McVay be given a three-level reduction to his offense level for his acceptance of responsibility, and also agreed to file a motion for a downward departure based on substantial assistance, pursuant to U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e), if the government determined that McVay's cooperation and substantial assistance warranted such a motion.

At sentencing, the presentence investigation report ("PSI") recommended a base offense level of 6 and the following adjustments: (1) a 26-level upward

6

adjustment based on a $1,390,800,000 loss (representing the total drop in value of the outstanding stock when the conspiracy was uncovered in March 2003 and the SEC temporarily suspended trading), pursuant to U.S.S.G. § 2B1.1(b)(1)(N) (2002); and (2) a 3-level reduction for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1. With an adjusted offense level of 29 and a criminal history category I (based on 0 criminal history points), McVay's Guidelines sentencing range was 87 to 108 months' imprisonment. The PSI recommended a sentence at the bottom of that range, 87 months.[1]

The government and McVay filed objections to the PSI.[2] The government also filed a § 5K1.1 motion for a downward departure from the Guidelines, citing McVay's substantial assistance in the investigation and prosecution of others. The

---

[1] The probation officer noted that if the government filed a § 5K1.1 motion, she would recommend a probationary term, with at least 6 months' home detention and a substantial fine and/or restitution. She suggested the following reasoning supported a downward departure based on substantial assistance:

> The conduct committed by this defendant is a shame. He is a single father who, with the exception of his actions in the instant offense, was successful in building a financially secure future for himself and his daughter. It is this officer's opinion that the individuals higher on the "food chain" of this conspiracy exploited the defendant's drive for success. This defendant, although he held a position of great significance (CFO), was not in the "family" who w[as] the foundation of this conspiracy. He was not involved in the "family meetings" and he did not direct anyone in the furtherance of the conspiracy.

[2] At the sentencing hearing, the district court determined that the government's objections were filed untimely because they were not filed within 14 days of receipt of the PSI. The government does not appeal that decision.

government noted that McVay made himself available on a "continuous and regular basis" and provided "information implicating several other culpable individuals." McVay's "immediate cooperation has allowed the HealthSouth case to be prosecuted at a pace which, on a relative basis, constitutes swift and efficient enforcement of the United States' criminal laws. Further, the details of the fraudulent scheme were exposed to the public shortly after discovery of the fraud due, in part, to the defendant's cooperation." The government continued: "The United States expects the defendant to continue his substantial assistance in the investigation and prosecution of others after the sentencing hearing is complete."

In connection with the substantial-assistance motion, based on McVay's adjusted offense level of 29, the government recommended that, despite McVay's cooperation, a "substantial term of imprisonment is required" given the seriousness of McVay's crimes. After noting that McVay "knowingly submit[ted] false and misleading financial statements to the markets . . ., knowing that the document he submitted had between 2 and $400 million of phoney cash," the government urged that "giving Mr. McVay anything other than a substantial term of imprisonment in this case sends the message to the markets that this type of conduct can be committed and committed successfully without punishment." The government ultimately urged a term of not less than 65 months' imprisonment.

8

At the sentencing hearing, the government presented the testimony of Neal A. Seiden, a senior staff accountant in the SEC Division of Enforcement, in support of the amount of loss. Seiden opined that a conservative estimate of the amount of loss to the stockholders was approximately $330 million.

In fact, the district court found that the amount of loss to the victims was approximately $400 million. It adopted the PSI's recommendations as to offense level, criminal history and sentencing range. Immediately after the government noted its substantial-assistance motion and requested a sentence of not less than 65 months, without further discussion or any explanation, the district court summarily stated: "All right. The Court departs downward to a Level 8 which, when combined with a criminal history category of I, creates a Guideline Imprisonment Range of 0 to 6 months, a fine range of $1,000.00 to $1,000,000.00, and a supervised release term of 2 to 3 years." The court then imposed the following sentence:

> First, you shall pay a fine of $10,000.00, with interest waived. I will not require restitution because the number of identifiable victims is so large as to make restitution impracticable. And determining complex issues of fact relating to the amount of the victims' losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is substantially outweighed by the burden on the sentencing process.

9

And thirdly, in light of the pending civil litigation to which you are a party defendant, the Court will not order restitution in this case on consideration of the other two findings I've just made.

You shall pay to the United States a special assessment of $200.00. And that special assessment and fine are due immediately. You shall be placed on probation for a term of 5 years as to Counts One and Two, separately, with the sentence on each count to run concurrently with the other.

You shall serve 6 months home detention for the first part of that probationary period. The home detention may include electronic monitoring as directed by the probation officer.

. . . .

You shall forfeit $50,000.00 to the United States which will be made available to the victims of your crime.

<u>The probationary sentence is influenced by the exemplary record you've compiled before becoming involved in this most serious kind of criminal activity and by the circumstances surrounding your daughter.</u>

(emphasis added). The foregoing is the <u>only</u> record explanation given by the

district court to support its downward departure, from an advisory Guidelines

range of 87 to 101 months' imprisonment to a probationary term, and McVay's

resulting sentence.

After the district court announced the terms of the sentence, the government

stated that, in addition to its objection to the ultimate sentence imposed, it objected

10

to "the Court's failure to follow 18 U.S.C. § 3553 and the factors that are supposed to be considered in the imposition of sentence," to which the district court responded:

> I have factored all of those considerations in imposing the sentence that I have. I do wish to point out that it's only because of your motion that I'm allowed to exercise any discretion. Otherwise, the discretion would be with the United States Attorney. If you hadn't made the motion for a downward departure, I would have had to sentence him to at least 87 months.

In its final (written) judgment, entered on June 7, 2004, the district court checked a box stating that the downward departure was "based on 5K1.1 motion of the government based on the defendant's substantial assistance." The court offered no other explanation or additional reasons. This appeal followed.

## II.

We review a district court's interpretation of the Sentencing Guidelines de novo and its factual findings for clear error. See United States v. Jordi, 418 F.3d 1212, 1214 (11th Cir.), cert. denied, 126 S. Ct. 812 (2005). Although we review a defendant's ultimate sentence for reasonableness, United States v. Booker, 543 U.S. 220 (2005), "[n]othing in Booker suggests that a reasonableness standard should govern review of the interpretation and application as advisory of the Guidelines by a district court." United States v. Crawford, 407 F.3d 1174, 1178

11

(11th Cir. 2005). This is so because "Booker did not affect 18 U.S.C. section 3742(f), which mandates remand of any case in which the sentence was imposed as a result of an incorrect application of the sentencing guidelines." Id. (internal quotation marks and citation omitted). Thus, whether the district court misapplied the Guidelines remains, according to our pre-Booker precedent, subject to de novo review. See United States v. Luiz, 102 F.3d 466, 468 (11th Cir. 1996) (engaging in de novo review of whether district court misapplied § 5K1.1 in refusing to grant downward departure).

Before we conduct a reasonableness review of the ultimate sentence imposed, "we first determine whether the district court correctly interpreted and applied the Guidelines to calculate the appropriate advisory Guidelines range." United States v. Williams, 435 F.3d 1350, 1353 (11th Cir. 2006) (citing Crawford, 407 F.3d at 1178). It is only after a district court correctly calculates the Guidelines range, which it still must do after Booker, that it may consider imposing a more severe or more lenient sentence. Id.; see also United States v. Caldwell, 431 F.3d 795, 798 (11th Cir. 2005) ("After United States v. Booker, . . . the district court is still required to correctly calculate the guidelines range, and the same standards of review apply." (footnote omitted)), cert. denied, 126 S. Ct. 1665 (2006); Crawford, 407 F.3d at 1178-79 (holding that after Booker, district courts

12

"remain[ ] obliged to 'consult' and 'take into account' the Guidelines in sentencing," and the Guidelines "remain an essential consideration in the imposition of federal sentences, albeit along with the factors in § 3553(a)"; observing that the consultation requirement is "inescapable").

We have held that "pursuant to 18 U.S.C. § 3742(a), a defendant may not appeal a court's refusal to make a downward departure." United States v. Castellanos, 904 F.2d 1490, 1497 (11th Cir. 1990) (citation omitted). We will, however, review the government's challenge to the extent of a departure under § 5K1.1 for an abuse of discretion. United States v. Blas, 360 F.3d 1268, 1274 (11th Cir. 2004). As we have recognized, "[o]nce it has made a 5K1.1 motion, the government has no control over whether and to what extent the district court departs from the Guidelines, except that if a departure occurs, the government may argue on appeal that the sentence imposed was 'unreasonable.'" United States v. Pippin, 903 F.2d 1478, 1485 (11th Cir. 1990) (emphasis added).[3]

---

[3] The government has not appealed the initial calculation of the Guidelines range in the PSI, which was adopted by the district court prior to its decision to grant a substantial-assistance departure. The government objected in the district court to the PSI's use of the 2002 Guidelines, arguing that the PSI used the wrong version of the Guidelines because the probation officer focused on the date of the last overt act, as charged in the information (November 2002), rather than the date of the offense of conviction (McVay did not withdraw from the conspiracy prior to March 2003). Cf. Pippin, 903 F.2d at 1482 (commission of overt act in furtherance of conspiracy after effective date of Sentencing Guidelines was not prerequisite to application of Guidelines in compliance with ex post facto clause where conspiracy continued after effective date of Guidelines) (citing United States v. Wells Fargo Armored Serv. Corp., 587 F.2d 782, 783 (5th Cir. 1979) (affirming conspiracy

13

The government concedes that a substantial-assistance departure from the Guidelines range was warranted here, but challenges the district court's enumeration of non-assistance-related grounds for downwardly departing, and the extent of the departure as being wholly unreasonable. The government adds that to the extent the district court provided two cursory explanations of its reasoning -- (1) the substantial-assistance motion, and (2) McVay's "exemplary record" and "the circumstances surrounding his daughter" -- the enumerated reasons did not provide sufficient support for its dramatic departure.

Section 5K1.1 provides that "[u]pon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines." U.S.S.G. § 5K1.1, p.s. The appropriate substantial-assistance reduction

> shall be determined by the court for reasons stated that may include, but are not limited to, consideration of the following:

conviction under Sherman Act after a plea of nolo contendere, even though defendant argued that his conviction violated the ex post facto clause "in that the indictment purported to charge a felony without alleging that overt acts occurred during the time period after December 21, 1974, when the offense was made a felony")). But, because the government has not appealed the district court's decision that the government's objection was untimely, on remand, the district court need not recalculate the initial Guidelines range, which is not disputed here. Thus, we start our analysis from the correctly calculated Guidelines range of 87 to 108 months' imprisonment, which was based on an adjusted offense level of 29 and a criminal history category I.

(1) the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered;

(2) the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;

(3) the nature and extent of the defendant's assistance;

(4) any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance;

(5) the timeliness of the defendant's assistance.

U.S.S.G. § 5K1.1(a), p.s.  The commentary to § 5K1.1 recognizes that the "nature, extent, and significance of assistance can involve a broad spectrum of conduct that must be evaluated by the court on an individual basis," and, thus, accords latitude to the sentencing judge to reduce a sentence based on "variable relevant factors." U.S.S.G. § 5K1.1 comment. (backg'd).  "The sentencing judge must, however, state the reasons for reducing a sentence under this section."  Id. (citing 18 U.S.C. § 3553(c)).  Thus, it is clear the Guidelines contemplate a substantial-assistance determination that is individualized to the defendant based on the relevant factors and more specific than a simple statement that the reduction is based on the defendant's substantial assistance.  Moreover, the commentary to § 5K1.1 requires the sentencing court to give "[s]ubstantial weight . . . to the government's

15

evaluation of the extent of the defendant's assistance."  U.S.S.G. § 5K1.1, comment. (n.3).

The only individualized analysis that we can discern in the instant sentencing calculation was the PSI's and the district court's vague references to McVay's "exemplary record" and "relationship with his daughter" as supporting the § 5K1.1 downward departure.   However, we have made clear that "[w]hen, on the Government's motion, a district court grants a downward departure under U.S.S.G. § 5K1.1 or reduces a sentence under Rule 35(b), the sentence reduction may be based only on factors related to the defendant's substantial assistance." Luiz, 102 F.3d at 469 (emphasis added); see also United States v. Aponte, 36 F.3d 1050, 1052 (11th Cir. 1994) (holding that a court, in considering a § 5K1.1 motion to depart below a statutory minimum, should only consider factors relative to a defendant's substantial assistance);  cf. United States v. Chavarria-Herrara, 15 F.3d 1033, 1037 (11th Cir. 1994) (reversing Rule 35(b) substantial-assistance departure, where district court considered factors such as the defendant's first-time offender status and good prison behavior in reducing his sentence).

Thus, the district court's consideration of McVay's "exemplary record" and "the situation with his daughter," in the context of a  § 5K1.1 substantial-assistance departure, was error as a matter of law and must be reversed.  Simply

16

put, although the sentencing court had discretion under § 5K1.1 to decide (1) whether to depart from the guidelines based on substantial assistance, and (2) if so, the reasonable extent of that departure, plainly it did <u>not</u> have discretion to consider factors altogether unrelated to the nature and extent of McVay's assistance.  See <u>Luiz</u>, 102 F.3d at 469; <u>cf.</u> <u>United States v. Davis</u>, 407 F.3d 1269, 1271 (11th Cir. 2005) (rejecting government's argument that district court's grant of § 5K1.1 motion rendered <u>Booker</u> error harmless beyond a reasonable doubt; "The flaw in the Government's argument is that the grant of § 5K1.1 did not give the sentencing court 'unfettered' discretion, but rather, gave the court only limited discretion to consider the assistance that Davis rendered.").

The foregoing prohibition on the consideration of factors unrelated to substantial assistance is consistent with a majority of the courts of appeals that have considered the issue.  See, e.g., <u>United States v. Pepper</u>, 412 F.3d 995, 999 (8th Cir. 2005) (holding that district court's consideration of non-assistance-related matters in the context of a § 5K1.1 motion was improper); <u>United States v. Pearce</u>, 191 F.3d 488, 492 (4th Cir. 1999) (holding that "any factor considered by the district court on a § 5K1.1 motion must relate to the 'nature, extent, and significance' of the defendant's assistance" (quoting U.S.S.G. § 5K1.1 comment. (backg'd)));  <u>United States v. Campbell</u>, 995 F.2d 173, 175 (10th Cir. 1993)

(holding that "a district court may depart below the minimum sentence set by Congress only to reflect substantial assistance by the defendant"); United States v. Valente, 961 F.2d 133, 134-35 (9th Cir. 1992) (rejecting defendant's argument that "once the court departed below the mandatory minimum sentence pursuant to the government's [substantial assistance] motion, it was free to depart even further downward based on Valente's 'aberrant' behavior"); United States v. Thomas, 930 F.2d 526, 529 (7th Cir. 1991) (holding that "only factors relating to a defendant's cooperation should influence the extent of a departure for providing substantial assistance under § 3553(e)"), overruled on other grounds by United States v. Canoy, 38 F.3d 893, 903-07 (7th Cir. 1994). Indeed, the assistance-related limitation on a district court's consideration of a § 5K1.1 motion formed the basis for our post-Booker reversal and remand for resentencing in Davis, in which we held that a § 5K1.1 motion does not render a Booker error harmless because a sentencing court is limited by the factors identified in § 5K1.1 when determining the extent of the downward departure. See 407 F.3d at 1271; see also United States v. Turnbough, 425 F.3d 1112, 1115 (8th Cir. 2005) (same) (citing Davis).

The district court's consideration of factors unrelated to substantial assistance was improper. Moreover, under the facts and circumstances of this

case, the district court's single mention of the government's substantial-assistance motion alone did not warrant the extraordinary departure granted in this case.

Section 5K1.1 allows a downward departure upon motion by the government based on the defendant's substantial assistance "for reasons stated." U.S.S.G. § 5K1.1(a), p.s. Here, the record contains no indication that the sentencing judge considered any of the § 5K1.1(a) factors. Moreover, in its written judgment, the court provided no reasons, other than the single fact of the government's motion, for the extent of its § 5K1.1 departure. Although the government's motion for a § 5K1.1 departure detailed the extent of McVay's assistance and its usefulness, the district court failed to consider the government's evaluation of the assistance provided, as required by Application Note 3. See U.S.S.G. § 5K1.1, comment. (n.3).

On this record, meaningful appellate review is simply not possible due to the district court's (1) erroneous consideration of non-assistance-related factors, and (2) failure to consider the § 5K1.1(a) factors or otherwise detail a permissible basis for the substantial-assistance departure upon which it did rely. Cf. United States v. Suarez, 939 F.2d 929, 933 (11th Cir. 1991) (observing that "[t]he district court's reasons [for departing] must be sufficiently specific so that an appellate court can engage in the meaningful review envisioned by the Sentencing

19

Guidelines"). Here there was no discussion by the district court of the assistance provided by McVay to the government. Nor was there any discussion about the nature and extent of that assistance, nor was there any reference, let alone any explanation for rejecting the government's recommendation of 65 months' in prison. Section 5K1.1 expressly enumerates, as we have noted, several particular factors for the district court to consider including the government's evaluation of the assistance, the truthfulness and reliability of the information provided by the defendant, any injury suffered or any danger or risk of injury to the defendant or his family resulting from his assistance, or, indeed, the timeliness of the defendant's assistance. U.S.S.G. § 5K1.1(a), p.s. None were so much as referenced by the district court. On remand, in considering the government's substantial-assistance motion, the district court is obliged to confine its § 5K1.1 analysis to assistance-related reasons supporting a departure and state its reasoning if it departs in such a manner as to enable us to engage in meaningful appellate review.

Because we must remand for resentencing in light of the district court's consideration of improper factors within the § 5K1.1 calculus and its failure to provide any rationale for its extraordinary departure, we have no occasion to address the permissible <u>extent</u> of a substantial-assistance departure or the overall

20

reasonableness of the ultimate sentence. We do however provide the following observations for guidance at resentencing. First, on remand, in deciding the nature and extent of a substantial-assistance departure, the district court should consider the factors expressly enumerated in § 5K1.1(a), p.s. Moreover, after it has decided the length of departure warranted by the substantial assistance motion, the district court is then obliged to take into account the advisory Guidelines range and the sentencing factors set forth in 18 U.S.C. § 3553(a) in fashioning a reasonable sentence. See Booker, 543 U.S. at 259-60. "The factors in § 3553(a) include: (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; (3) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; (4) the need to protect the public; and (5) the Guidelines range." United States v. Scott, 426 F.3d 1324, 1328-29 (11th Cir. 2005) (citing 18 U.S.C. § 3553(a)).

We add that when imposing a sentence falling far outside of the Guidelines range, based on the §3553(a) factors, "[a]n extraordinary reduction must be supported by extraordinary circumstances." United States v. Dalton, 404 F.3d 1029, 1033 (8th Cir. 2005); see also United States v. Moreland, 437 F.3d 424, 434 (4th Cir. 2006) (when district court imposes sentence substantially outside of the Guidelines range, "[t]he farther the court diverges from the advisory guideline

21

range, the more compelling the reasons for the divergence must be"); <u>United States v. Johnson</u>, 427 F.3d 423, 426-27 (7th Cir. 2005) ("How compelling [the] justification must be [to support a sentence varying from the Guidelines range] is proportional to the extent of the difference between the advisory range and the sentence imposed."). We pause to note that, in the absence of truly compelling reasons -- in the face of a multi-billion dollar securities fraud at the expense of the investing public -- a six-month probationary term given to the Chief Financial Officer, Senior Vice-President, and Treasurer of the company at the time of the fraud (who signed the Form 10-Q with full knowledge of its falsity), is not easily reconcilable with the basic factors enumerated by Congress in § 3553(a), including the need for a sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment.

Accordingly, we vacate and remand McVay's sentence for resentencing in a manner consistent with this opinion and with the Supreme Court's decision in <u>Booker</u>.

**VACATED AND REMANDED.**