**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**October 10, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

SHEILA DIANA FRENCH,

    Defendant-Appellant.

No. 04-5168

(D.C. No. 03-CR-181-JHP)
(N. D. Oklahoma)

**ORDER AND JUDGMENT**[*]

Before **BRISCOE** and **BALDOCK,** Circuit Judges, and **BRORBY**, Senior Circuit Judge.

Defendant Sheila French pled guilty to one count of maintaining a place for the purpose of manufacturing, distributing and using methamphetamine in violation of 21 U.S.C. § 856(a)(1), and was sentenced to a term of imprisonment of 240 months. French now appeals her sentence, claiming the district court committed constitutional error by relying on a number of judicially-found facts to mandatorily enhance her sentence under the federal sentencing guidelines, and misapplied the federal sentencing guidelines in

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

calculating the drug quantity attributable to her offense. We exercise jurisdiction pursuant to 28 U.S.C. § 1291, and reverse and remand with instructions to the district court to vacate French's sentence and resentence her.

I.

On August 27, 2003, Sergeant Harold Adair, a member of the Tulsa Police Department (TPD), received information about an eleven-month-old infant being treated for second-degree burns at Hillcrest Hospital in Tulsa County, Oklahoma. Adair drove to the hospital, viewed the infant, and observed what he believed to be "splash burns" on the infant's face, head, shoulders and back. According to Adair, a splash burn occurs when a hot liquid splashes on a person's skin. Adair had previously seen splash burns in methamphetamine laboratory accidents.

Adair spoke with the infant's mother, Lacey Kuhne. Kuhne indicated that her husband, Kenneth Tinsley, had been performing some work at a trailer owned by Sheila French, and that Kuhne and her infant had been inside the trailer visiting. Kuhne further indicated that the infant was sitting on the kitchen floor playing with some magnets on the refrigerator when something on the kitchen stove exploded. A person came into the kitchen, grabbed the item on the stove, and attempted to swing it over to the sink. In doing so, the person spilled some type of burning liquid onto the infant. According to Kuhne, there was a discussion among the adults present at the trailer whether they should take the infant to the hospital for treatment, with some, including French, expressing concern that hospital employees would recognize the infant's injuries as chemical burns.

Adair was familiar with the trailer described by Kuhne. He had received information approximately one month earlier that someone was cooking methamphetamine inside the trailer, and he had actually flown over the trailer in a helicopter in an attempt to observe activities at the trailer. In addition, Adair was aware from a previous investigation that French, the owner of the trailer, had purchased iodine crystals, a chemical commonly used to manufacture methamphetamine, on three separate occasions in September 2002.

Adair and another TPD officer traveled to French's trailer to investigate further the circumstances leading to the infant's burns. When they approached the front door of the trailer, they noticed a "real strong smell, sweet chemical solvent smell . . . ." ROA, Vol. III at 21. After repeatedly knocking on the front door for approximately two minutes, a person inside asked who was there. Adair responded that it was the police. A woman, later identified as French, opened the front door and stepped out onto the front porch. As she did so, smoke came out of the trailer and the chemical smell greatly increased. Upon questioning, French said she had heard about the infant being burned, but had not been present at the trailer when the accident occurred. French also stated "her understanding was that [the accident] occurred at a burn pile to the west and south of her trailer." Id. at 22. At Adair's request, French escorted the officers to the area of the burn pile. According to Adair, there was no indication that gasoline or other liquid had sprayed out from the burn pile, and it was obvious that the infant's burns had not occurred there.

Adair and French returned to the front porch of the trailer, where he explained to

-3-

her his belief that the infant had been burned inside the trailer in the kitchen area. Adair advised French that she had two choices: either to voluntarily consent to Adair and the other officer entering the trailer and looking for evidence relating to the burn incident, or to deny them consent which would require them to obtain a search warrant. French agreed to allow the officers to enter the trailer and search for evidence.

Inside the trailer, Adair observed burn marks on the carpet in front of the refrigerator. In the rest of the kitchen area, Adair observed various items, such as vision glassware, that he associated with the manufacture of methamphetamine. Adair and the other officer seized the following items from inside the trailer, all of which subsequently tested positive for methamphetamine: (1) a coffee grinder in the kitchen area that had a white powdery substance in it; (2) two glass jars in the kitchen refrigerator's freezer section that contained frozen liquid; (3) a container of liquid in the shop/work area; (4) a container of liquid in a small refrigerator on the back porch area; and (5) a plate with some loose methamphetamine on it, found in the master bedroom. In addition, Adair and the other officer found iodine crystals in the master bedroom along with approximately one to one-and-a-half ounces of phosphorous acid flakes. Based upon all of these items, Adair concluded that there was an ongoing methamphetamine laboratory operation inside of the trailer.

On December 11, 2003, a federal grand jury returned a three-count indictment against French and five other individuals (Jason Read, Brandon Jones, Jessica Gutierrez, Gregory Smith, and Ryan Cole). Count One of the indictment charged all six defendants

with conspiring, in violation of 21 U.S.C. § 846, to knowingly and intentionally manufacture and distribute 500 grams or more of a mixture of substance containing a detectable amount of methamphetamine. Count Two of the indictment charged French with maintaining a place in Osage County, Oklahoma, for the purpose of manufacturing, distributing and using methamphetamine in violation of 21 U.S.C. § 856(a)(1) and (b). Count Three of the indictment charged three of French's co-defendants (Jones, Gutierrez and Read) with attempting to manufacture methamphetamine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C).

On June 21, 2004, French pled guilty to Count Two of the indictment. The written plea agreement entered into by French stated, in pertinent part, as follows:

> I, SHEILA DIANE FRENCH, admit that on certain dates between November, 2001 and December, 2003, the exact dates unknown, within the Northern District of Oklahoma, I would and did knowingly allow my home to be used as a place where methamphetamine was manufactured, distributed or ingested. Methamphetamine was distributed or ingested to or by me to, from or with Jason Read, Ryan Cole, Brandon Jones, Rebecca Gutierrez and others at my residence in Osage County, Oklahoma. From time to time, chemicals were purchased by me with the help of Ryan Cole, Brandon Jones or Rebecca Gutierrez for Jason Read, which chemicals could be used for the manufacture of methamphetamine and were delivered at my residence in Osage County. Coffee filters or pans containing the residue of methamphetamine that had previously been manufactured were scraped or washed so that the methamphetamine residue could be used to ingest at my residence in Osage County. This statement of facts is an accurate summary of my knowledge of, and involvement in, the crime I am charged with in the Indictment filed against me in this cause. However, I SHEILA DIANE FRENCH, assert that the above statement of facts does not reflect the entire breadth and knowledge that I have concerning the entire scope of my activities.

Supp. ROA, Vol. I, Doc. 147 at 6.

On August 27, 2004, the probation office issued its presentence investigation report (PSR). The PSR concluded that French was "responsible for 1,007 grams of a mixture containing methamphetamine and 71.2 grams of ephedrine/pseudoephedrine," and thus was subject to a base offense level of 32 pursuant to U.S.S.G. § 2D1.8. ROA, Vol. II, PSR at 9-10. The PSR proposed three upward adjustments to the base offense level: (1) a six-level increase pursuant to U.S.S.G. § 2D1.1(b)(5)(C) because the offense involved the manufacture of methamphetamine and created a substantial risk of harm to the life of a minor; (2) a two-level increase pursuant to U.S.S.G. § 2D1.1(b)(1) because French possessed a loaded shotgun hidden under her bedroom mattress; and (3) a two-level increase pursuant to U.S.S.G. § 3C1.1 for obstruction of justice (due to French allegedly threatening to burn down the house of Elsa Marlin if she told authorities how the infant was burned at French's trailer). After applying a three-level downward adjustment or acceptance of responsibility, the PSR arrived at an adjusted offense level of 39. Combined with French's criminal history category of III, the PSR recommended a guideline range of 324 to 405 months. However, because the statutory maximum for the offense of conviction was 240 months, the PSR recommended imposing a sentence of 240 months.

French objected to various portions of the PSR, including its drug quantity calculations and its conclusion that she obstructed justice by threatening witness Elsa Marlin. French also filed a sentencing memorandum asserting that, in light of the Supreme Court's decision in Blakely v. Washington, 542 U.S. 296 (2004), the district

-6-

court was precluded from imposing any enhancements based upon facts outside of her guilty plea. In her sentencing memorandum, French asserted that the district court should arrive at an adjusted offense level of 9 (derived from imposing a base offense level of 12 and subtracting 3 levels for acceptance of responsibility), and a guideline range of 8 to 14 months.

The district court conducted a sentencing hearing on October 1 and 7, 2004. During the hearing, the government presented three witnesses: Adair, co-defendant Rebecca Gutierrez, and Elsa Marlin. French also testified on her own behalf. At the conclusion of the evidence, the district court made the following factual findings relevant to French's objections to the PSR:

> • The district court found, beyond a reasonable doubt, that French allowed Jason Read, her son, to manufacture methamphetamine in her residence and further had knowledge that he operated a methamphetamine laboratory in the well house located behind her house. ROA, Vol. IV at 257-58.
>
> • The district court found, beyond a reasonable doubt, that French "would demand some of the finished product [from Jason Read] when the process was completed." Id. at 258.
>
> • The district court found, beyond a reasonable doubt, that French did not want the infant to be taken to the hospital for treatment of its burns because of her concern that state authorities would be notified. Id.
>
> • The district court found, by a preponderance of the evidence, that French threatened to burn down Elsa Marlin's house if she (Marlin) told the police the truth about how the infant was burned. Id. at 259.
>
> • The district court found, beyond a reasonable doubt, "that the amount of drugs attributable to [French] in paragraphs 19 and 24 of the [PSR] [wa]s an extremely conservative amount in light of the drug activities occurring at [her] residence." Id. at 259. "The only amounts used in this calculation

were the drugs seized out of the residence on August 27, 2003. This calculation does not contain any drug amounts for activities occurring on other dates such as the amounts of methamphetamine [French] admitted to selling in the many manufacturing activities occurring at [her] residence, including [French] personally scraping pans which had been used to cook methamphetamine or the ingestion of methamphetamine on numerous occasions by [French] and others are her residence." Id. at 260.

As for the PSR's proposed enhancement based on French's possession of a loaded shotgun, the district court "reluctantly sustain[ed] [French]'s objection" "based upon the government's statement . . . that [it] believe[d] it was clearly improbable that the loaded shotgun was connected to the drug activities . . . ." Id. at 262. In turn, the district court applied an adjusted offense level of 37 which, together with French's criminal history category of III, produced a guideline range of 262 to 327 months. Ultimately, the district court sentenced French to 240 months' imprisonment, the statutory maximum for her crime of conviction.

## II.

### *Booker* error

French contends on appeal that the district court violated her Sixth Amendment rights, as outlined in United States v. Booker, 543 U.S. 220 (2005), by relying on judicially-found facts to mandatorily enhance her sentence under the federal sentencing guidelines. In Booker, the Supreme Court extended its holding in Blakely to the federal sentencing guidelines, holding that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or

proved to a jury beyond a reasonable doubt." 543 U.S. at 244. To remedy the constitutional infirmity of the federal sentencing guidelines, the Court in Booker invalidated their mandatory nature, requiring a district court to consult them in an advisory fashion. Id. at 245-46.

In United States v. Gonzalez-Huerta, 403 F.3d 727 (10th Cir. 2005) (en banc), we identified two types of errors that could arise out of a district court's pre-Booker sentencing of a criminal defendant. First, a constitutional Booker error occurred if a district court "re[lied] upon judge-found facts . . . to enhance a defendant's sentence mandatorily." Id. at 731. Second, a non-constitutional Booker error occurred if a district court "appl[ied] the Guidelines in a mandatory fashion, . . . even though the resulting sentence was calculated solely upon facts that were admitted by the defendant, found by the jury, or based upon the fact of a prior conviction." Id. at 731-32.

Here, although the district court purported to apply the correct, "beyond a reasonable doubt" standard with respect to all but one of the sentencing enhancements (i.e., the obstruction of justice enhancement, which it applied based upon findings made using a preponderance of the evidence standard), the district court itself made the pertinent factual findings. Thus, it did not comply with Booker's requirement that a jury make such findings. See United States v. Miller, 450 F.3d 270, 275 (7th Cir. 2006) (noting that Booker "specif[ied] the appropriate decision maker (the jury) and the burden of persuasion (beyond a reasonable doubt)"). Accordingly, we conclude that the district court committed constitutional Booker error in sentencing French.

Because French adequately preserved the error below by timely objecting on the basis of Blakely, we review her sentence for harmless error. United States v. Corchado, 427 F.3d 815, 820 (10th Cir. 2005). In doing so, the question is whether the district court's error was harmless under Rule 52(a) of the Federal Rules of Criminal Procedure. United States v. Lang, 405 F.3d 1060, 1064 (10th Cir. 2005). Rule 52(a) states: "Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." The government bears the burden of demonstrating the error was harmless and, because the error was of constitutional dimension, must do so beyond a reasonable doubt. Lang, 405 F.3d at 1065.

In United States v. Dazey, 403 F.3d 1147, 1175 (10th Cir. 2005), we noted there are at least two ways that a defendant's substantial rights may be affected in cases of constitutional Booker error. First, a defendant's substantial rights may be affected if "a jury applying a reasonable doubt standard would not have found the same material facts that a judge found by a preponderance of the evidence." Id. Second, a defendant's substantial rights may also be affected if there is "a reasonable probability that, under the specific facts of his case as analyzed under the sentencing factors of 18 U.S.C. § 3553(a), the district court judge would reasonably impose a sentence outside the Guidelines range." Id. (footnote omitted).

After reviewing the record in this case, we conclude that French's substantial rights were, indeed, affected by the district court's constitutional Booker error. As noted, the district court, at sentencing, made a number of factual findings which in turn resulted

-10-

in various enhancements to French's offense level under the federal sentencing guidelines. Notably, the district court expressly stated that all but one of those findings were made utilizing the "beyond a reasonable doubt" standard. The sole exception was the district court's finding that French had threatened to burn down the home of Elsa Marlin if Marlin told authorities the truth about how the infant was burned. In making this finding, the district court expressly noted that it was relying on a preponderance of the evidence standard. By doing so, the district court implicitly acknowledged that the evidence before it was not sufficient to satisfy the "beyond a reasonable doubt" standard. In turn, a review of the sentencing hearing transcript indicates that this factual issue hinged almost exclusively on whether the district court believed Elsa Marlin, who testified that she was threatened by French, or whether the court believed French, who denied threatening Marlin. Although the district court resolved this credibility determination in favor of Marlin's testimony, it presumably did not believe the issue to be so one-sided that it could make its finding under a "beyond a reasonable doubt" standard (as it did with all of its other factual findings), and a review of the sentencing hearing transcripts confirms that conclusion. These transcripts provide a basis for concluding that both Marlin and French were less than credible for multiple reasons, including their history of drug use and criminal histories.

Had the district court not imposed the two-level enhancement for obstruction of justice, French would have been subject to an adjusted offense level of 35 which, combined with her criminal history category of III, would have resulted in a guideline

-11-

range of 210 to 262 months, well below the 262 to 327 month range calculated by the district court, and also below the statutory maximum sentence of 240 months actually imposed by the district court. Thus, we conclude that the constitutional Booker error committed by the district court was not harmless, and that French is therefore entitled to be resentenced.

*Drug quantity findings*

French also contends the district court misapplied the Sentencing Guidelines in calculating her base offense level. More specifically, French complains that the district court erroneously held her responsible for waste water or other liquid byproducts found in four containers seized from her trailer. We review de novo whether the district court properly applied the Sentencing Guidelines. United States v. McVay, 447 F.3d 1348, 1353 (10th Cir. 2006).

During the search of French's trailer, the police seized, among other things, four containers of colored liquid that were confirmed by subsequent laboratory testing to contain methamphetamine. In calculating French's base offense level, the PSR took the total weight of the liquid estimated to be in these containers, i.e., 35.5 ounces, and treated it as a mixture containing methamphetamine. ROA, Vol. II, PSR at 8. The PSR in turn converted this total amount into 2,726 kilograms of marijuana, and imposed a base offense level of 32. Id. at 10. French objected to these calculations, arguing, in pertinent part, that it was improper to use the total weight of the liquid found in the containers to calculate her base offense level. More specifically, French argued (a) no scientific

-12-

measurements were conducted to determine the actual amount of methamphetamine contained in the liquid, and (b) the liquid was not marketable as found, "but instead required the removal of the water to make the methamphetamine distributable." Aplt. App. at 17. In short, French argued that the majority of the liquid was waste water that should be excluded from the drug quantity calculations pursuant to the commentary to U.S.S.G. § 2D1.1.

At the sentencing hearing, the government presented two pieces of evidence relevant to this issue. First, the government submitted a laboratory report confirming that methamphetamine was "identified" in the liquid found in the containers. Aplt. App. at 28 (lab report). Second, the government presented the testimony of co-defendant Rebecca Gutierrez. Gutierrez testified, in pertinent part, that the containers found in the freezer in French's kitchen contained what she termed "freezer dope." ROA, Vol. III at 69. According to Gutierrez, "freezer dope" was a waste product of methamphetamine manufacturing (i.e., primarily acetone) and, if itself "cooked down," would produce approximately a gram or so of usable methamphetamine. Id. At the conclusion of the sentencing hearing, the district court overruled French's objections and adopted the drug quantity calculations set forth in the PSR. In doing so, however, the district court did not specifically address French's argument that the bulk of the liquid was unusable.

The propriety of the district court's drug quantity calculations hinge on the interpretation of U.S.S.G. § 2D1.1, i.e., the Guidelines' Drug Quantity Table. Note (A) to the Drug Quantity Table states, in pertinent part:

-13-

> Unless otherwise specified, the weight of a controlled substance set forth in the table refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance.

U.S.S.G. § 2D1.1, note (A) (2003) (emphasis added).  In turn, Application Note 1 states:

> "Mixture or substance" as used in this guideline has the same meaning as in 21 U.S.C. § 841, except as expressly provided.  Mixture or substance does not include materials that must be separated from the controlled substance before the controlled substance can be used.  Examples of such materials include the fiberglass in a cocaine/fiberglass bonded suitcase, beeswax in a cocaine/beeswax statue, and waste water from an illicit laboratory used to manufacture a controlled substance.  If such material cannot readily be separated from the mixture or substance that appropriately is counted in the Drug Quantity Table, the court may use any reasonable method to approximate the weight of the mixture or substance to be counted.

Id. cmt. n. 1 (2003) (emphasis added).

As noted by French, the uncontroverted evidence presented at the sentencing hearing indicated that the methamphetamine contained in at least some, if not all, of the liquid seized from French's trailer was not in a usable form.  Rather, according to Rebecca Gutierrez's unchallenged testimony, that liquid would first have had to have been "cooked down" in order to produce a usable form of methamphetamine.  Further, again according to Gutierrez's unchallenged testimony, the liquid, when cooked down, would not have produced a substantial amount of methamphetamine (i.e., approximately a gram or so per container).  Thus, under the express language of Application Note 1, it was improper for the district court to have relied upon the entire weight of the liquid in calculating the drug quantity attributable to French.  See United States v. Combs, 379 F.3d 564, 571 (9th Cir. 2004) ("it is well established that methamphetamine waste water

is irrelevant to sentencing"); United States v. Sprague, 135 F.3d 1301, 1305 (9th Cir. 1998) (discussing why, pursuant to Application Note 1 to § 2D1.1, waste water should be excluded for purposes of determining base offense level); see also United States v. Treft, 447 F.3d 421, 423 n.1 (10th Cir. 2006) (acknowledging, but finding it unnecessary to apply, Application Note 1 to § 2D1.1).

The district court's error in this regard was far from harmless. By taking into account the entire weight of the liquid, the district court found that French was responsible for 1,007 grams of a mixture containing methamphetamine. ROA, Vol. II, PSR at 10. Had the district court instead relied on the uncontroverted testimony of Rebecca Gutierrez (i.e., that at least two of the containers, if cooked down, would each only have produced approximately one gram of usable methamphetamine), it would have found French responsible for a substantially lower quantity of methamphetamine, and in turn presumably imposed a lower base offense level.[1] Thus, this error also justifies a remand for resentencing.

*Structural error*

In her final issue, French argues that the district court's mandatory application of the Sentencing Guidelines constitutes structural error. We, and more recently the

---

[1] To be sure, the district court could have made additional findings regarding the amount of methamphetamine that had been produced at French's trailer over time. Such a finding would likely have resulted in a substantial amount of methamphetamine, and in turn a high base offense level. However, the district court declined to make any specific findings in this regard, and instead relied solely on the substances seized during the search of French's trailer.

Supreme Court, have rejected this very argument. <u>See</u> <u>Washington v. Recuenco</u>, 126 S.Ct. 2546, 2553 (2006) (holding, in case arising from Washington state, that <u>Blakely</u> error did not constitute structural error); <u>United States v. Dowlin</u>, 408 F.3d 647, 668 (10th Cir. 2005) (holding that constitutional <u>Booker</u> error is not structural in nature); <u>Gonzalez-Huerta</u>, 403 F.3d at 734 (holding that non-constitutional <u>Booker</u> error is not structural).

We REVERSE and REMAND to the district court with instructions to vacate French's sentence and resentence her. In doing so, we in no way express an opinion regarding what the ultimate sentence should or should not be.

Entered for the Court


Mary Beck Briscoe
Circuit Judge

-16-