[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUL 11, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-16645
Non-Argument Calendar

_____

D. C. Docket No. 03-00191-CR-UWC-HGD

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

MICHAEL MARTIN,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

**(July 11, 2006)**

Before CARNES, HULL and MARCUS, Circuit Judges.

HULL, Circuit Judge:

This is the second time the government has appealed the sentence of

defendant-appellee Michael Martin, a former HealthSouth Corporation ("HealthSouth") executive, who pled guilty to conspiracy to commit securities fraud and mail fraud and falsify books and records, in violation of 18 U.S.C. § 371, and falsifying books and records, in violation of 15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(5), and 78ff, 17 C.F.R. § 240.13b2-1, and 18 U.S.C. § 2.  In both appeals the parties have agreed that Martin's advisory guidelines range is 108 to 135 months' imprisonment, and that Martin's substantial assistance to the government warrants a downward departure pursuant to U.S.S.G. § 5K1.1.  The hotly contested dispute both times has been over whether the extremely lenient sentence the district court gave is reasonable.

The district court originally sentenced Martin to 60 months' probation.  In the first appeal, this Court vacated that sentence for lack of a record capable of meaningful appellate review and remanded for resentencing.  United States v. Martin, 135 Fed. Appx. 411 (11th Cir. June 21, 2005) (unpublished).

At the resentencing, the government recommended a § 5K1.1 downward departure to 42 months' imprisonment, which equates to a 9-level departure. Instead, the district court granted Martin a 23-level downward departure and imposed a sentence of 7 days' imprisonment.  The government again appeals. After review, we again vacate Martin's sentence in its entirety.

## I. FACTUAL BACKGROUND

A factual summary outlining Martin's fraud is attached to his guilty plea. The Pre-sentence Investigation Report ("PSI") also details the massive fraud in this case, and at sentencing, Martin withdrew any objection to the PSI. Thus, the two documents establish these facts.

At all relevant times, HealthSouth claimed to be the nation's largest provider of outpatient surgery, diagnostic imaging, and rehabilitative healthcare services, with approximately 1,800 locations across all 50 states. HealthSouth's common stock was listed on the New York Stock Exchange. The management of HealthSouth provided guidance to the investing public regarding anticipated earnings per share, and in turn, professional securities analysts disseminated to the public their estimates of the company's expected performance. If a company, such as HealthSouth, announces earnings that fail to meet or exceed analyst expectations, the price of the company's stock typically will decline.

From at least 1994 until March 2003, a group of HealthSouth officers conspired to artificially inflate HealthSouth's reported earnings and earnings per share, and to falsify reports about HealthSouth's overall financial condition. The HealthSouth officers made, and directed accounting personnel to make, false and fraudulent entries in HealthSouth's books and records for the purpose of falsely

reporting HealthSouth's assets, revenues, and earnings per share and in order to defraud investors, banks, and lenders. As a result, HealthSouth's public financial records overstated its financial position cumulatively by billions of dollars from 1994 to 2002, and public investors purchased overvalued shares of HealthSouth's stock, which plummeted from $3.91 per share to $.11 per share when the massive fraud was revealed.

Defendant Martin was employed by HealthSouth from 1989 to 2000, and served as its Chief Financial Officer ("CFO") from October 1997 until he resigned in March 2000. As early as 1994, Martin became aware that HealthSouth was not meeting its earnings-per-share projections. After Martin became CFO in 1997, he began reviewing quarterly preliminary income statements showing HealthSouth's true and accurate financial results, which showed that HealthSouth was not meeting earnings-per-share projections made by its Chief Executive Officer ("CEO"), Richard Scrushy. By Martin's own admission, at the direction of Scrushy, Martin falsified numbers to inflate HealthSouth's stated earnings to meet Scrushy's projections and Wall Street's expectations.

Martin also attended numerous meetings in which members of the accounting department discussed how the financial statements could be altered to meet Scrushy's earnings-per-share projections. Martin repeatedly discussed with

4

Scrushy the fact that the income statements provided to the Securities and Exchange Commission ("SEC") and the investors were inaccurate, and he tried to dissuade Scrushy from perpetrating further fraud. Martin nevertheless signed HealthSouth's 10-Q and 10-K forms beginning in 1997 and continuing through the third quarter of 1999, with the knowledge that the numbers in the attached financial statements were false and thus the financial statements misrepresented the company's financial condition.

As noted earlier, the overstatement of HealthSouth's financial position in its public records as a result of the massive and prolonged fraud summed to billions of dollars.[1] The most direct victims of the fraud were the investing public, HealthSouth shareholders, and the company. HealthSouth had many shareholders, some of whom invested their life savings in HealthSouth stock and saw their investment plummet to pennies per share. A conservative estimate of the stock value loss attributable to Martin's fraud was $1,390,800,000 or approximately $1.4 billion.

There were also many other collateral victims of Scrushy and Martin's fraud, including (1) HealthSouth employees, particularly those who were

---

[1]The factual summary filed in support of Martin's guilty plea references the false entries in HealthSouth's quarterly and annual financial statements filed with the SEC from 1994 to 2002 and states: "The cumulative inflations summed to billions of dollars."

terminated and those who had participated in the company's stock ownership plan or pension fund; (2) employees of contractors who were dependent on HealthSouth contracts for income; (3) banks and other lenders who loaned money to HealthSouth based on falsified financial information; and (4) competing health service providers who lost business or financing based on the false information. See United States v. McVay, 447 F.3d 1348, 1350 (11th Cir. 2006).

Although many victims suffered devastating losses, HealthSouth's officers benefitted by receiving huge salaries and bonuses. Martin's income was over $14 million from just 1997 to 2000: $3,339,237 in 1997; $5,820,910 in 1998; $1,632,776 in 1999, and $4,080,959 in 2000. As detailed later, Martin agreed to a $2.375 million forfeiture, and the district court also imposed a $50,000 fine, both of which Martin immediately paid by check. At the time of the PSI in 2004, Martin had a net worth of over $8.9 million.

## II.  PROCEDURAL HISTORY

In March 2003, certain of Martin's co-conspirators revealed the fraud to federal authorities. Martin subsequently met with Federal Bureau of Investigation ("FBI") agents, admitted his role in the conspiracy, and thereafter cooperated substantially with the government.

On April 8, 2003, the government filed a three-count information against

6

Martin, charging him with: (1) one count of conspiracy to commit securities fraud and mail fraud and falsify books and records, in violation of 18 U.S.C. § 371 (Count One); and (2) one count of falsifying books, records, and accounts, in violation of 15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(5), and 78ff, 17 C.F.R. § 240.13b2-1, and 18 U.S.C. § 2 (Count Two). The information also included a forfeiture count (Count Three). Pursuant to a plea agreement, Martin pled guilty to all three counts.

## A. First Sentencing in 2004

The PSI indicated that Martin's offense level was 31 and his criminal history category was I, resulting in a guidelines sentence range of 108 to 135 months' imprisonment.[2] Martin's base offense level of 6 was increased to level 34 by these enhancements: (1) 18 levels under U.S.S.G. § 2F1.1(b)(1)(S) because the fraud loss was over $80 million; (2) 4 levels under § 3B1.1(a) because Martin was an organizer or leader of a criminal activity that was extensive; (3) 2 levels under § 3B1.3 for Martin's abuse of a position of public and private trust; (4) 2 levels under § 2F1.1(b)(5)(C) because his offenses involved sophisticated means; and (5) 2 levels under § 2F1.1(b)(2)(A) because his offenses involved more than minimal

_____

[2]The 1998 version of the guidelines was used in the PSI, and no party raised any issue in the district court or on appeal as to what version applies. All guidelines cites herein are to the 1998 version of the guidelines.

planning. Martin's offense level of 34 was reduced by 3 levels under § 3E1.1 due to his acceptance of responsibility.

On June 19, 2004, the district court held a sentencing hearing. The government had already filed a motion for downward departure, pursuant to U.S.S.G. § 5K1.1, based on Martin's substantial assistance. At the sentencing hearing, the government argued that the court should depart down 6 levels to offense level 25 and impose a sentence of 62 months' imprisonment.[3] The government pointed out that while Martin's assistance was valuable, Martin nevertheless was "the most culpable of those who have been sentenced to date"; that "[h]e was the most senior officer, he had the most authority, and he was involved the longest"; that "he obtained substantial income and status, social status, from this position at HealthSouth"; and that a lesser sentence would not sufficiently deter such conduct.

The district court adopted the PSI's calculations that Martin's offense level was 31, his criminal history category was I, and his guidelines sentence range was 108 to 135 months' imprisonment. Although the district court granted the government's § 5K1.1 motion, the district court departed 21 levels down to offense level 10, which yielded a guidelines range of 6 to 12 months' imprisonment.

---

[3]With an offense level of 25 and criminal history category I, Martin's guidelines range would be 57 to 71 months' imprisonment.

Although objecting to the extent of the § 5K1.1 departure, the government asked for a sentence of at least 12 months' imprisonment. Even with that 21-level departure, the district court still imposed no imprisonment. Rather, the district court imposed a sentence of 60 months' probation with a special condition of 6 months' home detention on each of Counts One and Two, to run concurrently. At the sentencing, Martin agreed to a forfeiture of $2.375 million, and the district court imposed a fine of $50,000. The government objected that the extent of the departure was unreasonable.

In its written judgment entered June 28, 2004, the district court checked the box stating that the downward departure was "based on 5K1.1 motion of the government based on the defendant's substantial assistance," and offered no further reasons. The government appealed, and this Court vacated and remanded because the district court failed to specify reasons for the extraordinary departure under § 5K1.1, and thus the record was incapable of meaningful appellate review. Martin, 135 Fed. Appx. at 415-16.

**B.    Resentencing**

The district court held a resentencing hearing on September 20, 2005, at which the district court again granted the government's § 5K1.1 motion for downward departure based on Martin's substantial assistance. At that hearing, the

9

government adopted its previous characterization of Martin's assistance and also acknowledged that Martin had continued to assist the government after his first sentencing, including testifying for at least five days at Scrushy's trial. The government further acknowledged that Martin had attempted to dissuade Scrushy from pursuing the fraudulent conduct and had been at least minimally successful for some period.

However, the government stressed that Martin nevertheless was a leader of the conspiracy; that he abused the trust of the investors, bankers, and others who placed him in his leadership position within HealthSouth; that his conduct was egregious; and that he was the most culpable of the defendants to come before the court for sentencing. To balance Martin's cooperation against the seriousness of his conduct and his relative culpability, the government requested that the district court sentence Martin to 42 months' imprisonment. This request represented a downward departure of 9 levels from offense level 31 to 22. Thus, the government's requested 42-month sentence represented a reduction in excess of 60 percent from the low end of Martin's pre-departure 108-135-month guideline range.[4]

_____

[4]The government's request was framed as a sentence of 42 months' imprisonment. Because Martin's criminal history category is I, the downward departure in this case is reflected in the extent of the reduction in Martin's offense level. Martin's offense level was 31, and given Martin's criminal history category of I, it takes a reduction of 9 levels, to level 22, to reach a

Martin's counsel disputed the government's position that he was the most culpable of the defendants sentenced or to be sentenced by the court and emphasized his extraordinary cooperation with the government. Martin's counsel further stressed that he tried to dissuade others from the fraudulent conduct and ultimately resigned, and that he also cooperated with plaintiffs who sued him for his conduct, without any promise of leniency or reduced judgment.

After hearing from the government and the defense, the district court announced its decision to depart downward by 23 levels to an offense level of 8, which, when combined with Martin's criminal history category of I, yielded a guidelines range of 0 to 6 months' imprisonment, a fine range of $1,000 to $1 million, and a supervised release term of 2 to 3 years. The district court then sentenced Martin to 7 days' imprisonment and 2 years' supervised release. The district court also reimposed the $50,000 fine and forfeiture of $2.375 million, which Martin had paid in 2004.

In explaining its reasons for this extraordinary departure under § 5K1.1, the district court described Martin's "unhesitating assistance" to the FBI, the SEC, and HealthSouth's auditors and shareholders. The district court adopted the government's description of Martin's assistance:

guidelines range of 41-51 months' imprisonment and thus a 42-month sentence.

> That this defendant's assistance enabled the government to swiftly prosecute Richard Scrushy and several other major participants in the fraud; it allowed the government to provide a timely assurance to the financial markets that the illegal conduct had ended and that corrective action was being taken; and it allowed HealthSouth to reconstruct its books and records and to begin its recovery.

The district court emphasized Martin's crucial role in the Scrushy trial and in the SEC's civil proceedings, and found Martin's assistance to have been "outstanding," "invaluable," and "complete," "completely reliable," and "immediate," even as the government was appealing Martin's previous sentence. The district court further noted that, while there was no risk of physical injury, Martin subjected "his financial well-being to imminent jeopardy" and would almost certainly incur substantial civil judgments against him as a result of his cooperation. Additionally, the district court indicated that it was remarkable that Martin continued to cooperate with the government even as the government was appealing his original sentence. As to the extraordinary nature of the assistance, the district court stated: "As the Court found earlier, this is the only time in its 25-year history as a Judge when this kind of cooperation has been forthcoming from a defendant."

As to the sentencing factors set forth in 18 U.S.C. § 3553(a), the district court found that the offense conduct was "an aberration" for an otherwise outstanding citizen; that Martin had "sacrificed his own personal fortune in favor

12

of the victims of the fraud"; that the conspiracy predated Martin's participation; and that he tried to convince Scrushy to abandon the fraudulent course of conduct. The district court further stated, with regard to Martin's resignation: "While for purposes of the sentencing guidelines he didn't withdraw his participation in the conspiracy;[5] for purposes of Booker considerations, the Court finds that he did withdraw from the conspiracy."

The district court stated that it "finds that some period of incarceration is necessary to reflect the seriousness of the crime." Even though the court recognized this § 3553(a) factor, the court then reasoned that a more lengthy sentence than 7 days "would, in the court's judgment, promote a disrespect for the law" because "from the point of view of the government, the man most singularly responsible for this criminal conduct [Richard Scrushy] has been found not guilty and will serve no time at all."[6] The court concluded that "under those circumstances, to subject this defendant to a lengthy period of imprisonment would not serve as just punishment and would not promote respect for the law."

The district court also determined that Martin's "devastating experience"

---

[5]The district court noted that Martin had not withdrawn from the conspiracy for purposes of the sentencing guidelines because he failed to inform law enforcement officers of the fraud.

[6]The district court observed that Aaron Beam, one of the "core defendants," was sentenced to only three months' imprisonment, and unlike Martin, there was no evidence that Beam ever tried to dissuade Scrushy or to withdraw from the conspiracy.

13

would deter not only Martin but others similarly situated from engaging in similar conduct. The court found that "[a] longer period of incarceration would be greater than necessary to achieve the deterrence objectives, and would be unjust."

Finally, the district court noted that Martin had forfeited $2.375 million and that Martin was also a defendant in several civil lawsuits. The district court stated that "a longer period of incarceration [might] well impede the ability of the plaintiffs in those cases to collect on any [civil] judgment that they may receive" against Martin.

The government objected to the departure to 7 days' imprisonment as an unreasonable departure from the statutory maximum of 15 years and the low end of the advisory guidelines of 108 months. The government now appeals.

## III. DISCUSSION

Even after the Supreme Court's decision in United States v. Booker, 543 U.S. 220, 125 S. Ct. 738 (2005), in fashioning an appropriate sentence, the district court still must correctly calculate first the appropriate advisory Guidelines range. United States v. Williams, 435 F.3d 1350, 1353 (11th Cir. 2006) (citing United States v. Crawford, 407 F.3d 1174, 1178 (11th Cir. 2005)). The district court then may consider imposing a more severe or more lenient sentence, and this Court reviews the ultimate sentence for reasonableness. Id. "Before we conduct a

14

reasonableness review of the ultimate sentence imposed, 'we first determine whether the district court correctly interpreted and applied the Guidelines to calculate the appropriate advisory Guidelines range.'" McVay, 447 F.3d at 1353 (quoting Williams, 435 F.3d at 1353). We review de novo a district court's interpretation of the sentencing guidelines, including § 5K1.1, and its factual findings for clear error. Id. at 1352-53.

In this case, it is undisputed that Martin's advisory guidelines range is 108 to 135 months' imprisonment. Instead, the dispute is over whether the extent of the § 5K1.1 departure was reasonable and whether the ultimate sentence imposed was reasonable under Booker. We first review the principles governing § 5K1.1 departures, then Booker, and finally apply them to Martin's sentence.

## A.    Section 5K1.1 Departures

Here, the district court departed downward based on the government's § 5K1.1 substantial-assistance motion. As we have previously explained, "[o]nce it has made a 5K1.1 motion, the government has no control over whether and to what extent the district court departs from the Guidelines, except that if a departure occurs, the government may argue on appeal that the sentence imposed was unreasonable." Id. (quoting United States v. Pippin, 903 F.2d 1478, 1485 (11th Cir. 1990)) (quotation marks omitted). In determining the extent of a substantial-

assistance departure, the district court must consider the factors set forth in §

5K1.1(a).  Id. at 1355.  Those factors, which are non-exclusive, are: (1) "the court's

evaluation of the significance and usefulness of the defendant's assistance, taking

into consideration the government's evaluation of the assistance rendered"; (2) "the

truthfulness, completeness, and reliability of any information or testimony

provided by the defendant"; (3) "the nature and extent of the defendant's

assistance"; (4) "any injury suffered, or any danger or risk of injury to the

defendant or his family resulting from his assistance"; and (5) "the timeliness of

the defendant's assistance."  U.S.S.G. § 5K1.1(a).

This is not an exhaustive list.  The district court may consider other factors,

but only if the factors relate to the assistance provided by the defendant.  United

States v. Crisp, — F.3d —, No. 05-12304, slip op. at 8-9 (11th Cir. July 7, 2006)

("[I]n meting out a substantial assistance departure the court may consider factors

outside the § 5K1.1(a) list, but only if they are related to the assistance rendered.");

United States v. Luiz, 102 F.3d 466, 469 (11th Cir. 1996) (stating "[w]hen . . . a

district court grants a downward departure under U.S.S.G. § 5K1.1 . . . , the

sentence reduction may be based only on factors related to the defendant's

substantial assistance"); United States v. Aponte, 36 F.3d 1050, 1052 (11th Cir.

1994); see also U.S.S.G. § 5K1.1 cmt. background (indicating that the focus is on

16

the "nature, extent, and significance" of the defendant's assistance to the government).  Post-Booker, this Court has reiterated that district courts are prohibited from considering sentencing factors unrelated to the nature and extent of a defendant's assistance in making § 5K1.1 departures.  McVay, 447 F.3d at 1355; United States v. Davis, 407 F.3d 1269, 1271 (11th Cir. 2005).[7]  Further, as explained in McVay, a defendant may not appeal a district court's refusal to make a § 5K1.1 departure, but if the court departs, we will review the government's challenge to the extent of a departure under § 5K1.1 for an abuse of discretion. McVay, 447 F.3d at 1353.

In addition, even pre-Booker, the extent of a district court's departure from the guidelines had to be reasonable.  Williams v. United States, 503 U.S. 193, 202, 112 S. Ct. 1112, 1120 (1992); United States v. Blas, 360 F.3d 1268, 1274 (11th Cir. 2004); United States v. Melvin, 187 F.3d 1316, 1322-23 (11th Cir. 1999); United States v. Pippin, 903 F.2d 1478, 1485 (11th Cir. 1990).  When a sentencing court departed from the guidelines, the reviewing court determined the

---

[7]A refusal to depart, however, may be based on factors other than substantial assistance. Luiz, 102 F.3d at 469-70.  While a court may reward a defendant only for substantial assistance, the court's decision to grant a § 5K1.1 motion remains discretionary and the court may consider other factors, such as the seriousness of the offense, in refusing to depart.  See United States v. Manella, 86 F.3d 201, 204 (11th Cir. 1996) (stating that "the only factor that may militate in favor of a Rule 35(b) reduction is the defendant's substantial assistance," but "[n]othing in the text of the rule purports to limit what factors may militate against granting a Rule 35(b) reduction" or "the factors that may militate in favor of granting a smaller reduction"); Luiz, 102 F.3d at 469-70 (applying Manella to § 5K1.1 departures).

17

reasonableness of the departure in light of the statutory factors to be considered in imposing a sentence, as stated in 18 U.S.C. § 3553(a), and the reasons the district court provided for departing.  Blas, 360 F.3d at 1274; Melvin, 187 F.3d at 1322-23; United States v. Nilsen, 967 F.2d 539, 546 (11th Cir. 1992).

## B.    Post-Booker

As we all now know, Booker made the guidelines advisory.  District courts still must correctly calculate the advisory guidelines range, and we review any Booker-based departures outside that range for reasonableness in light of the § 3553(a) factors and the reasons stated by the district court for departing.  See, e.g., Williams, 435 F.3d at 1354-55.  As we recently explained, "[m]oreover, after it has decided the length of departure warranted by the substantial assistance motion, the district court is then obliged to take into account the advisory Guidelines range and the sentencing factors set forth in 18 U.S.C. § 3553(a) in fashioning a reasonable sentence."  McVay, 447 F.3d at 1356 (citing Booker, 543 U.S. at 259-60, 125 S. Ct. at 764-65) (first emphasis added).

The § 3553(a) factors include: "'(1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; (3) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; (4) the need to protect the public; and (5)

18

the Guidelines range,'" id. at 1356-57 (citation omitted), as well as (6) the kinds of sentences available, 18 U.S.C. § 3553(a)(3); (7) the need to avoid sentencing disparities among similar defendants who have been found guilty, 18 U.S.C. § 3553(a)(6); and (8) the need to provide restitution to victims of the offense, 18 U.S.C. § 3553(a)(7). "[W]hen imposing a sentence falling far outside of the Guidelines range, based on the § 3553(a) factors, an extraordinary reduction must be supported by extraordinary circumstances." McVay, 447 F.3d at 1357 (alteration, citation, and quotation marks omitted).

On appeal, "'[i]n reviewing the ultimate sentence imposed by the district court for reasonableness, we consider the final sentence, in its entirety, in light of the § 3553(a) factors.'" United States v. Valnor, — F.3d —, 2006 WL 1529118, at *5 (11th Cir. June 6, 2006) (quoting United States v. Thomas, 446 F.3d 1348, 1349 (11th Cir. 2006)); see also United States v. Winingear, 422 F.3d 1241, 1245 (11th Cir. 2005) ("We do not apply the reasonableness standard to each individual decision made during the sentencing process; rather, we review the final sentence for reasonableness."). The party challenging the sentence has the burden of establishing that the sentence is unreasonable. United States v. Talley, 431 F.3d 784, 788 (11th Cir. 2005).

Further, our "[r]eview for reasonableness is deferential. We must evaluate

19

whether the sentence imposed by the district court fails to achieve the purposes of sentencing as stated in section 3553(a)." Id. "[T]here is a range of reasonable sentences from which the district court may choose . . . ." Id. There will also be sentences outside the range of reasonableness that do not achieve the purposes of sentencing stated in § 3553(a) and that thus the district court may not impose. Id.; Crisp, — F.3d at —, slip op. at 11.

We now turn to Martin's sentence.

## C.    Martin's Sentence

As noted earlier, the government does not dispute that the district court properly calculated Martin's guidelines range. Nor does the government argue that the district court erred in granting Martin a § 5K1.1 downward departure based on his substantial assistance. Indeed, the government argued in the district court and maintains on appeal that Martin's assistance was extraordinary and merited an extraordinary downward departure, such as a 42-month sentence.[8] Rather, the government argues that the district court's 23-level departure under § 5K1.1 and imposition of a 7-day sentence are both patently unreasonable given the massive and prolonged fraud perpetuated by Martin in conspiracy with other HealthSouth officers.

---

[8]A 42-month sentence would have amounted to a 9-level departure, or more than a 60 percent departure from the low end of Martin's guidelines range of 108 months' imprisonment.

With regard to the extent of the § 5K1.1 departure, the government points out that while Martin's cooperation was extraordinary, Martin did not voluntarily approach the government and expose the fraud when he learned of it, but instead cooperated only after other co-conspirators revealed the fraud and Martin's role in it. The government stresses that the district court improperly gave no weight to its recommendation and evaluation of Martin's cooperation. The government also takes issue with the district court's interpretation of § 5K1.1(a)(4) and its consideration of Martin's cooperation that placed him in financial (as opposed to physical) jeopardy as a § 5K1.1(a)(4) factor in determining the extent of the departure. The government stresses that the § 5K1.1(a)(4) factor concerns physical, not financial, injury and that in any event the only financial risk to Martin was that of civil lawsuits by the victims of his crimes. His exposure to civil liability was not caused by his cooperation in the criminal case.

As to the 7-day sentence and the § 3553(a) factors, the government emphasizes that the district court unreasonably overemphasized Martin's assistance and failed to consider adequately other important sentencing factors, such as the severity of Martin's offense, his financial gain from the crimes in salary and bonuses, and the need to deter similar conduct by individuals who might consider the risk of a 7-day sentence a small price to pay for the possibility of reaping

21

millions of dollars by fraudulent means.

The government also relies on McVay, wherein this Court addressed the government's challenge to the same district court's extraordinary downward departure in sentencing one of Martin's co-conspirators. In that case, defendant McVay's guidelines range was 87 to 108 months' imprisonment, and the district court downwardly departed 21 levels (from an offense level 29 to an offense level 8) to a range of 0 to 6 months' imprisonment, and then imposed a sentence of 60 months' probation. McVay, 447 F.3d at 1349. As we did in the government's prior appeal in Martin's case, this Court vacated McVay's sentence and remanded, inter alia, because the district court failed to provide reasons for the departure, and thus the sentence was incapable of meaningful appellate review. Id. at 1355-56. As a result, this Court did not have occasion to decide the permissible extent of the § 5K1.1 departure or whether McVay's probationary sentence was reasonable. However, the Court in McVay did provide the following guidance about the reasonableness of a probationary sentence under the circumstances of the "multi-billion dollar securities fraud" at HealthSouth:

> We pause to note that, in the absence of truly compelling reasons–in the face of a multi-billion dollar securities fraud at the expense of the investing public–a six-month probationary term given to the Chief Financial Officer, Senior Vice-President, and Treasurer of the company at the time of the fraud (who signed the Form 10-Q with full knowledge of its falsity), is not easily reconcilable with the basic

22

factors enumerated by Congress in § 3553(a), including the need for a sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment.

Id. at 1357.

In Martin's case, we now are squarely presented with the question of whether a 23-level departure under § 5K1.1 for his assistance and an ultimate sentence of 7 days' imprisonment for this multi-billion-dollar securities fraud are reasonable. The answer is easy: they are not.

The extent of the § 5K1.1 departure alone is unreasonable in this case. We fully accept the district court's determination that Martin's cooperation was extraordinary and merits a correspondingly extraordinary departure. Indeed, the government recognized this fact by recommending only a 42-month sentence even though (1) Martin's guidelines range was 108-135 months (i.e., from 9 to approximately 11 years), and (2) his statutory maximum was 15 years (i.e., 5 years on Count One and 10 on Count Two). We also recognize that there is always a range of reasonable § 5K1.1 choices that district courts are in the best position to make. However, the choice of a 23-level guidelines departure under § 5K1.1 to a 0-6 months guidelines range was unreasonable where Martin's crimes yielded an advisory guidelines range of 9-11 years' imprisonment and a potential sentence of 15 years. Martin's cooperation, while commendable and extremely valuable, is not

23

a get-out-of-jail-free card. Martin's cooperation does not wash the slate clean. Yet departing 23 levels to a 0-6 months range effectively accomplishes that by permitting a sentence of no jail time at all, or 7 days, which is close to none.

The 23-level departure was also unreasonable because the district court based the extent of the departure in part on an erroneous interpretation of § 5K1.1(a)(4). Section 5K1.1(a)(4) permits consideration of whether Martin suffered "any injury" or "any danger or risk of injury to the defendant or his family resulting from his assistance." U.S.S.G. § 5K1.1(a)(4). The government argues that only physical injury is encompassed within § 5K1.1(a)(4) and that the district court erred in considering how Martin's cooperation would help plaintiffs in civil lawsuits against him, and thus determining that his cooperation placed his financial well-being in imminent jeopardy. We need not decide whether § 5K1.1(a)(4) is restricted to physical injury because, at a minimum, the type of "injury" or "risk of injury" resulting from cooperation contemplated by § 5K1.1(a)(4) certainly does not include civil liability to the victims of Martin's fraud. Those plaintiffs are entitled to pursue civil lawsuits because of Martin's fraud and not because of his assistance to the government. Thus, the district court's misapplication of § 5K1.1(a)(4) also contributed to making the extent of the § 5K1.1 departure unreasonable. Indeed, there is no evidence that Martin incurred "any injury" or

24

faces "any danger or risk of injury" resulting from his assistance to the government.  See U.S.S.G. § 5K1.1(a)(4).[9]

Turning to the ultimate sentence, the district court's 7-day sentence is shockingly short and wholly fails to serve the purposes of sentencing set forth by Congress in § 3553(a).  Martin's crimes and the district court's punishment are so wildly disproportionate that we readily conclude that the district court's 7-day sentence is also unreasonable and must be vacated.  We explain the many reasons why the district court erred in its consideration of the § 3553(a) factors, and why we, for the second time, must vacate Martin's sentence.

First, the district court's 7-day sentence wholly fails to take into account the nature and circumstances of the offense and the need for the sentence to reflect the seriousness of the crime.  See 18 U.S.C. § 3553(a)(1), (a)(2)(A).  Martin knowingly participated in a massive and prolonged fraud, served as a leader in that fraud, financially benefitted substantially from the fraud, and cooperated only after the fraud was revealed.  While the district court emphasized Martin's lack of a criminal record and viewed his fraudulent conduct as an "aberration" in his

---

[9]Given that the PSI indicated that Martin had a net worth of $8,932,135, the district court also erred in finding that Martin had "sacrificed his personal fortune in favor of the victims of the fraud."  This reasoning is faulty in any event, as Martin's salary and bonuses from HealthSouth helped to create that personal fortune.  Martin's fraudulent conduct in artificially inflating HealthSouth's assets and revenues, and in turn HealthSouth's stock price, contributed to the perception of a successfully run company and to Martin's receiving over $14 million in salary and bonuses between 1997 and 2000.

otherwise outstanding life, Martin's criminal history category of I already takes into account his lack of a criminal record. Despite this lack of a criminal record, Martin's offense conduct spanned a period of years, during which Martin consistently abused the public trust and played a leadership role in a conspiracy that resulted in over a billion dollars of loss harming thousands of victims. Martin's crimes are major league economic crimes that harmed not only individual victims but also many institutions and companies. This type and scale of crime is peculiarly corrosive to the economic life of the community, as demonstrated by the deleterious effects the large-scale fraud in this case had on the healthcare industry and the securities markets. Martin not only participated in this fraud for over three years as HealthSouth's CFO before finally resigning, he also chose not to approach authorities about the conspiracy until they had learned independently about his criminal conduct. Put simply, the 7-day sentence imposed by the district court wholly fails to take into account the egregious years-long nature of Martin's crimes.

The 7-day sentence imposed by the district court also utterly fails to afford adequate deterrence to criminal conduct. See 18 U.S.C. § 3553(a)(2)(B). Because economic and fraud-based crimes are "more rational, cool, and calculated than sudden crimes of passion or opportunity," these crimes are "prime candidate[s] for

26

general deterrence." Stephanos Bibas, <u>White-Collar Plea Bargaining and Sentencing After Booker</u>, 47 Wm. & Mary L. Rev. 721, 724 (2005). Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment. Yet the message of Martin's 7-day sentence is that would-be white-collar criminals stand to lose little more than a portion of their ill-gotten gains and practically none of their liberty.

Our assessment is consistent with the views of the drafters of § 3553. As the legislative history of the adoption of § 3553 demonstrates, Congress viewed deterrence as "particularly important in the area of white collar crime." S. Rep. No. 98-225, at 76 (1983), <u>reprinted in</u> 1984 U.S.C.C.A.N. 3182, 3259. Congress was especially concerned that prior to the Sentencing Guidelines, "[m]ajor white collar criminals often [were] sentenced to small fines and little or no imprisonment. Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business." <u>Id.</u> The fact that Martin's guidelines range was 108-135 months' imprisonment evinces Congress's attempt to curb judicial leniency in the area of white collar crime. The district court's 7-day sentence not only fails to serve the purposes of § 3553, but even worse, undermines those purposes.

27

While the district court stated summarily that "[Martin's] devastating experience will deter others similarly situated from engaging in similar criminality," the district court failed to explain how Martin's 7-day sentence contributes to general deterrence in any way. The district court's confidence that "this defendant has been effectively deterred from any further criminal conduct" (emphasis added) speaks to the goal of preventing recidivism, see 18 U.S.C. §3553(a)(2)(C), but not to the general need "to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). Indeed, the Congress that adopted the § 3553 sentencing factors emphasized the critical deterrent value of imprisoning serious white collar criminals, even where those criminals might themselves be unlikely to commit another offense:

> [It is our] view that in the past there have been many cases, particularly in instances of major white collar crime, in which probation has been granted because the offender required little or nothing in the way of institutionalized rehabilitative measures . . . and because society required no insulation from the offender, without due consideration being given to the fact that the heightened deterrent effect of incarceration and the readily perceivably receipt of just punishment accorded by incarceration were of critical importance. The placing on probation of [a white collar criminal] may be perfectly appropriate in cases in which, under all the circumstances, only the rehabilitative needs of the offender are pertinent; such a sentence may be grossly inappropriate, however, in cases in which the circumstances mandate the sentence's carrying substantial deterrent or punitive impact.

S. Rep. No. 98-225, at 91-92 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3274-

75. Rather than deter crime by others, Martin's 7-day sentence suggests that those similarly situated to Martin could profit from fraudulent conduct and, even if caught, escape severe consequences by cooperating with the government after the fact.[10]

Finally, the district court erred by justifying Martin's lenient sentence in part on the basis that "from the point of view of the government, the man most singularly responsible for this criminal conduct [Richard Scrushy] has been found not guilty and will serve no time at all." Regardless of the government's original theory of the overall fraud scheme in this case, § 3553(a)(6) does not permit the district court to compare Martin's sentence with the "sentence" of a man whom a jury acquitted of criminal conduct, however groundless that acquittal may seem in light of the evidence in this record. While the need for consistent sentences among similarly situated defendants is a statutory sentencing factor, § 3553(a)(6) confines

---

[10]The district court reasoned that a longer prison term might well impede the ability of civil plaintiffs to collect on a judgment against Martin. This reasoning is also faulty because in almost every fraud case a jail term has that effect and would mean white collar criminals could avoid serving time to allow them to work and repay civil plaintiffs. As we noted in Crisp, the Sentencing Commission has determined that loss serves as a measure of the seriousness of the offense and the defendant's relative culpability. Crisp, — F.3d at —, slip op. at 14 (quoting U.S.S.G. § 2B1.1 cmt. background). As we further explained in Crisp,

> The court's sentencing theory turned that policy on its head. The more loss a defendant has caused, the greater will be the amount of restitution due, and the greater the incentive for a court that places the need for restitution above all else to shorten the sentence in order to increase the time for the defendant to earn money to pay restitution. Therefore, the more loss a criminal inflicts, the shorter his sentence. That approach cannot be deemed reasonable.

Id.

that consideration to "the need to avoid unwarranted sentenc[ing] disparities among defendants with similar records <u>who have been found guilty</u> of similar conduct." 18 U.S.C. § 3553(a)(6) (emphasis added). Because Scrushy was found not guilty, he is not a valid comparator for § 3553(a)(6) purposes. As a result, the fact that Scrushy will not serve prison time is utterly irrelevant to Martin's sentence.

In sum, we agree with the government's position in its brief: "If any sentence is unreasonable, it is this one." A much less substantial departure than that awarded by the district court would properly reward Martin for his substantial and extraordinary cooperation, encourage others in his position to cooperate, and satisfy the goals embodied in § 3553(a). Martin's cooperation, even viewed as extraordinary and commendable, cannot erase the enormity of Martin's underlying criminal conduct in the billion-dollar fraud scheme he played a major role in perpetrating.

We do not express an opinion as to what would constitute a reasonable sentence. The district court on remand will exercise discretion in fashioning an appropriate sentence consistent with what we have stated in this opinion, and there is a range of reasonable sentences. A 7-day sentence is not nearly within that range. It is not remotely commensurate with the seriousness and extensive scale of

30

the crimes and does not promote respect for the law, does not provide just punishment for the offense, as § 3553(a)(2)(A) requires, and does not afford adequate deterrence to the criminal conduct here, as § 3553(a)(2)(B) mandates.

Accordingly, we vacate Martin's sentence and remand this case for resentencing in a manner consistent with this opinion and with the Supreme Court's decision in Booker.

## V. REASSIGNMENT

Finally, based on our review of the record and the elements that this Court considers in determining whether to reassign a case to a different judge where there is no indication of actual bias, see United States v. Torkington, 874 F.2d 1441, 1447 (11th Cir. 1989) (per curiam), we have determined it wiser to remand this case with instructions to reassign it to a different judge. This is the second appeal in Martin's case and the second time we have had to reverse the sentence that the district court gave Martin. On remand, the district court changed its sentence from 60 months' probation to only 7 days' imprisonment and failed to properly take into account the § 3553(a) factors. In light of the two reversals in this case and three other appeals in which we have reversed the same judge for extraordinary downward departures that were without a valid basis in the record,[11] we find it

---

[11]See McVay, 447 F.3d at 1356; United States v. Livesay, 146 Fed. Appx. 403, 405 (11th Cir. Aug. 30, 2005) (unpublished) (reversing "dramatic" 18-level reduction in offense level

31

likely that "the original judge would have difficulty putting his previous views and findings aside."  Id.

Our settled practice is to direct a specific judge to reassign a case.  That judge has been the chief judge, where the chief judge was not the original judge in the case.  See, e.g., Onishea v. Hopper, 126 F.3d 1323, 1343 (11th Cir. 1997), vacated on other grounds, 133 F.3d 1377 (11th Cir. 1998); Chudasama v. Mazda Motor Corp., 123 F.3d 1353, 1374 (11th Cir. 1997); United States v. Remillong, 55 F.3d 572, 577 (11th Cir. 1995); Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1230 (11th Cir. 1993); United States v. Spears, 827 F.2d 705, 709 (11th Cir. 1987).  Where the chief judge is the original judge, we then direct the senior most active judge to reassign it.  See 28 U.S.C. § 136(e).  Accordingly, pursuant to our supervisory power over the district courts, we remand this case with instructions that it be reassigned by the most senior active judge of the District Court for the Northern District of Alabama.  See Torkington, 874 F.2d at 1446 ("We have the authority to order reassignment of a criminal case to another district judge as part of our supervisory authority over the district courts in this Circuit."); 28 U.S.C. § 2106.

**SENTENCE VACATED AND REMANDED WITH INSTRUCTIONS.**

based on record that provided "scant basis to assess reasonableness" of departure); United States v. Botts, 135 Fed. Appx. 416, 420-21 (11th Cir. June 21, 2005) (unpublished) (reversing "extraordinary" 26-level reduction in offense level based on record that "is incapable of meaningful appellate review").